2013 UT App 111

# THE UTAH COURT OF APPEALS

JERI BOOTH WILLIAMS,
*Petitioner and Appellee,*
*v.*
CLARK EDWARD WILLIAMS,
*Respondent and Appellant.*

Memorandum Decision
No. 20120208-CA
Filed May 2, 2013

Third District, West Jordan Department
The Honorable Andrew H. Stone
No. 110417432

T. Jake Hinkins and Aaron S. Gwilliam, Attorneys
for Appellant
Steve S. Christensen, Craig L. Pankratz, and
Samuel J. Sorensen, Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Memorandum Decision,
in which JUDGES JAMES Z. DAVIS and WILLIAM A. THORNE JR.
concurred.

ORME, Judge:

¶1 Clark Williams appeals from a civil stalking injunction issued against him in favor of his ex-wife, Jeri Williams. We affirm.

¶2 Following their separation in 2011, Jeri asked Clark not to contact her anymore and directed him to speak with her attorney about any matters related to their ongoing divorce proceeding. She

also changed residences and redacted all of her new information from their divorce documents to keep Clark from knowing where she lived. Despite her clear requests for no contact, Clark sent Jeri a photograph of her new home in a text message in August 2011. Jeri reported this incident to police, who in turn contacted Clark. Clark assured the police that he would not contact Jeri anymore. He also sent Jeri an email with the subject line, "i promise not to contact you anymore."

¶3     Clark was not true to his word. On the contrary, he continued his attempts to interact with Jeri. Between the months of August and November 2011, he sent at least sixteen more emails to a shared family email account, to which Jeri had direct access, that were either addressed specifically to her or addressed to their children but that discussed her. One email accused Jeri of "destroy[ing] the family" and of infidelity. Another pleaded with Jeri to meet Clark in person so that they could resolve their differences.

¶4     A November email called Jeri a "con" and accused her of being sexually active with multiple partners in high school. In this same email, Clark claimed to be in possession of nude photographs of Jeri and threatened to send them both to her and to her church leader, apparently as a way to expose what he claimed was her "two faced" nature. Clark and Jeri both testified that a short while later, Clark sent Jeri an envelope containing two photographs of a nude woman.

¶5     In addition to sending emails and nude photographs, Clark made other contact with Jeri after August 2011. Clark mailed two letters to Jeri related to their divorce and some jointly owned property in direct contravention of an October 2011 no-contact order issued by the California court responsible for the couple's pending divorce. He called Jeri's cell phone multiple times after unblocking his number on her phone—by using her social security number to portray the request made of her phone company as being authorized by her—and he told Jeri that he had hired an

investigator to watch her. Clark also went to Jeri's home, and when she shut the door after seeing he was there, he continued to try to talk to her.

¶6     By his own admission at the stalking injunction hearing, Clark had hundreds of contacts with Jeri after she, the police, and the California divorce court had all directed him to leave her alone. He testified, "The hundreds of letters that she got and texts, the emails, everything, they were—they were expressions of love and concern, that I wanted a second chance. . . . I wanted to leave no doubt in her mind how I felt." When asked directly if he followed through on his commitment to leave her alone, he said, "No."

¶7     "In order to enter a civil stalking injunction, the district court must conclude that an offense of stalking has occurred that meets the criteria for the crime of stalking." *Coombs v. Dietrich*, 2011 UT App 136, ¶ 2, 253 P.3d 1121 (citation and internal quotation marks omitted). *See Allen v. Anger*, 2011 UT App 19, ¶¶ 1, 14, 248 P.3d 1001. A person commits the offense of stalking when he or she "intentionally or knowingly engages in a course of conduct directed at a specific person" and "knows or should know" that the conduct would cause a reasonable person to fear for his or her safety or "suffer other emotional distress." Utah Code Ann. § 76-5-106.5(2) (LexisNexis 2012).[1] A "course of conduct" is defined as "two or more acts directed at or toward a specific person," including "acts in which the actor . . . surveils, threatens, or communicates to or about a person . . . directly, indirectly, or through any third party." *Id.* § 76-5-106.5(1)(b).

¶8     Clark argues that because the district court's written findings mention only his phone calls, text messages, and the

---

1. Because the statutory provisions in effect at the relevant time do not differ materially from the statutory provisions now in effect, we cite the current version of the Utah Code as a convenience to the reader.

photograph of Jeri's home, that only those contacts can be considered as evidence of stalking, and that these acts by themselves do not support the district court's conclusion that their "volume" supported the issuance of a stalking injunction. However, it is clear from the transcript of the injunction hearing that the district court was concerned not only with these specific contacts, but with all of the evidence presented, including the emails sent to Jeri and Clark's efforts to "undo[]" Jeri's attempts to block communication with him. The court stated, "While individually they don't add up to much, I'm concerned about . . . the quantity of them." In any event, we can affirm the district court's injunction on any grounds apparent to us from the record, *see Bailey v. Bayles*, 2002 UT 58, ¶¶ 9–12, 52 P.3d 1158, and the relevant stalking statute does not require myriad contacts but only two or more, *see* Utah Code Ann. § 76-5-106.5(1)(b). The record clearly supports a determination that Clark engaged in two or more contacts with Jeri that involved threats, surveillance, or communication to or about Jeri.[2] *See id.*

¶9    Clark argues that even if he is found to have engaged in two or more acts directed toward Jeri, he did not do so intentionally or knowingly and his contact with her would not cause a reasonable person to suffer emotional distress. He argues that the requisite emotional distress must be more than "mere anxiety or annoyance" and that stalking only occurs when there is repeated conduct that is "outrageous and intolerable" and "evoke[s] outrage or revulsion," going beyond conduct that is merely "unreasonable, unkind, or unfair." *See Allen v. Anger*, 2011 UT App 19, ¶ 16, 248 P.3d 1001 (citation and internal quotation marks omitted). Clark attempts to characterize his contacts with Jeri as those typical of failed familial relationships, contending that they "were not threats" but "pleas that she return to him" offered by a man

---

2. Clark himself admits that "he had directly attempted communication with Jeri on two or more occasions through text messaging or phone calls."

"desperately trying to preserve a 34-year-old marriage." We are not convinced.

¶10 Jeri correctly points out that the "outrageousness" requirement Clark cites from *Allen* was included in the 2003 version of the stalking statute and not the version of the statute in effect today or at the time of Clark's course of conduct. Utah courts have not yet determined whether the revisions made to the stalking statute since 2003 were "intended to overrule the outrageousness requirement." *Id*. ¶ 16 n.4. But we need not determine whether the outrageousness requirement set forth in *Salt Lake City v. Lopez*, 935 P.2d 1259, 1264 (Utah Ct. App. 1997), has been overruled because Clark's behavior in this case clearly rises to a level that would cause a reasonable person to suffer emotional distress under almost any standard, including that of outrageousness.

¶11 Emotional distress is defined as "significant mental or psychological suffering, whether or not medical or other professional treatment or counseling is required." Utah Code Ann. § 76-5-106.5(1)(d) (LexisNexis 2012). Each individual act does not have to be sufficient to cause emotional distress by itself. *Ellison v. Stam*, 2006 UT App 150, ¶¶ 28–29, 136 P.3d 1242. Instead, the cumulative effect of the acts can be taken into account in determining whether mental or psychological suffering would result. *Id*. Here, Clark ignored orders from Jeri, the police, and a California divorce court to cease contacting her. He threatened to send nude photographs of Jeri to her religious leader. He sent emails to their children via an email account to which Jeri had ready access, in which he called Jeri names and accused her of infidelity and sexual promiscuity. Despite her efforts to conceal her new address, Clark discovered where she lived, sent her a text message with a photograph of her new residence, and showed up there in person. Clark used her social security number when contacting the phone company to undo her efforts to block him from texting or calling her. The fact that he did all of these things with the intent, as he himself put it, "to leave no doubt in her mind how I felt" and was fully aware that he was not respecting her

wishes is a clear indication that his behavior was both intentional and knowing. We easily determine that when considering the cumulative effects of Clark's actions, a reasonable person subjected to such conduct would suffer "significant mental or psychological suffering." *See* Utah Code Ann. § 76-5-106.5(1)(d) (LexisNexis 2012).

¶12    Affirmed.[3]

---

3. The Utah Rules of Appellate Procedure require that a party seeking "attorney's fees incurred on appeal shall state the request explicitly and set forth the legal basis for such an award" in the argument section of the party's brief. Utah R. App. P. 24(a)(9). Jeri did not request fees in the manner contemplated by rule 24. Instead, she requested an award of her attorney fees incurred on appeal in a separate motion filed after briefing was concluded. Accordingly, her request is denied.